DANIEL JORDAN v. THE OVERSEERS OF DAYTON.

.A patent issued by the United States, securing the exclusive right to manufacture and use certain medicines, does not authorize the administration of them, in the character of a practicing physician, without conforming to the laws of the state where administered.

ERROR to the court of common pleas of Montgomery county.

The overseers of the poor brought an action of debt, before a justice of the peace, against Jordan to recover certain penalties for practicing physic in violation of the statute regulating the practice of physic and surgery. The case was appealed to the court ·of common pleas, and judgment was there rendered in favor of the ·overseers of the poor; to reverse which, this writ was prosecuted.

The facts were agreed between the parties as follows:

It was admitted that Jordan, not being a member of any medi- ·cal society of the state, and not being qualified to practice medi- ·cine, as required by the statute, did administer medicine to, and prescribe for one William Sullivan and one William Prigg, and received fees and rewards therefor. That on January 25, 1823, a patent was regularly issued from the United States to Samuel Thompson, granting to him, his heirs and assigns, for the term of fourteen years, the exclusive right of making, constructing, using, :and vending to others to be used, a certain new and useful improvement, being a mode of preparing, mixing, compounding, administering, and using the medicine described in certain specifi- ·cations thereto annexed, in the manner and in the diseases set forth in said specification. It was also further admitted that Jor- ·dan was the assignee of Thompson, and vested with all the rights 295] and privileges conferred upon *Thompson by the patent, and that the medicines prescribed and used by Jordan in his treatment ·of Prigg and Sullivan, were the same set forth in the patent and ʇspecifications, and were administered for the diseases therein men-

tioned. Also, that on the —— day of ——, 1813, a patent was granted to the same Samuel Thompson with specifications substantially the same as those attached to the patent of 1823, and conferring the same rights and privileges.

CORWIN and COLLET, for plaintiff in error:

The defense set up, in the case agreed, requires the court to set-- tle in the first place, the true construction and effect of section 11 of the act of February 26, 1824, entitled "an act to incorporate medical societies, for the purpose of regulating the practice of physic and surgery, in this state." It is under this section that the action is brought. We contend that the facts admitted in this case do not bring the defendant within the penalties provided in the law, and now sought to be recovered of him, as a practitioner of *physic* or *surgery.* The first clause of section 11 of the act incorporating medical societies is expressed in language which it is not difficult to understand, especially when interpreted in reference to the whole law, its intention, and the object had in view by the legislature. After making various provisions concerning the study of medicine as a science, plainly intended to provide modes and means by which that science, as now generally understood, should be taught, they go on, in section 11, to provide that "*no person*, other than the members of said medical societies, shall, after the 1st day of July next, be permitted to practice physic or surgery, in this state, and if any person, not being a member of said societies, shall *practice physic or surgery*, he shall not be entitled," etc. The first question to be determined is, what is the act designated by the legislature, using the terms just cited? It is contended, by the defendant in error, that every recommendation of any specific remedy for a particular disease is a practicing of physic within the meaning of this act; for such must be the ground taken, in effect, before a right of recovery can be urged against this defendant.

*The agreed case admits that the defendant, in two in- [296 stances *only*, did advise the use of some of the medicines mentioned in Thompson's patent, for some of the complaints enumerated in the schedule which makes a part of the patent. Every fact necessary to make out the plaintiff's case, which is not expressly admitted or proved, in a penal action, is presumed not to exist.

The law under consideration very clearly intended to prevent **every** person, not a member of a medical society, from presenting

Jordan *v*. Overseers of Dayton.

himself to the public as a person skilled in *the system* and science of physic or surgery, which it was its object to encourage, by providing persons known to be conversant with that science, as now practiced and taught, who should examine such as should present themselves, as properly qualified, by a thorough acquaintance with that science. This law, when it speaks of *physic* and surgery, means those sciences which treat of all known diseases, and propose the remedies for all, and not a patent for a medicine which is held out to the world as a remedy for one, or, at most, a very few of those disorders, which it is the province of a practitioner of physic to understand and cure. By an examination of the patent under which it is admitted defendant acted, it will be found that the diseases therein enumerated, to which alone the remedies he used are applicable, make up but a small portion of the disorders, which it is the province of a practitioner of physic to treat and cure. Hence, it is very clear that the selling and pointing out the application of these medicines alone, can not be said, within the meaning of this statute, to be the practice of physic, in the general sense in which it is there used. If such construction be put upon this section of the law, then every merchant or druggist who sells a bottle of Godfrey's Cordial, or of La Mott's Drops, or a box of Lee's Pills, is guilty of practicing physic, within the meaning of this act; for, in each of these cases, a printed list of the diseases in which the medicince should be used, with the quantity and number of the doses, is sold with the medicine; and this is prescribing and receiving pay for it, and yet it certainly has never been understood to be a practicing of physic, nor were such cases in the mind of the legislature, when they employed the terms above referred to in this act.

297] *Upon the grounds assumed by the defendants in error, every tooth-drawer, every female *accoucheur*, every nurse who applies any of the many effectual, simple cures of a burn, or ordinary flesh wound of a child, is a practitioner of *physic* or *surgery*, if it could be shown that any of these had received compensation for their labor, this being included.

But, in the second place, we contend that one, or even two instances of administering any medicine, can not be said to be a practicing of physic. This is done by almost every head of a family in this country. It is something more than this that is implied in the term practice, in the law under which plaintiff in

Jordan *v.* Overseers of Dayton.

error is sued. It is not only administering, prescribing, and selling medicine, but it is either a habitual and long-continued series of such acts, or it is a few instances of the kind, accompanied with a public profession of the character of a practitioner of physic, that constitutes the character in the view of the legislature. Neither of these cases is made out by the facts in this case. Jordan, it is not admitted or proved, ever held himself forth to the public as a doctor, nor can it be said that the two instances of his using the patent medicine, as set out in the agreed case, constitute him a practitioner of physic.

*Second.* The state legislature can not prohibit the profitable use, by the patentee and his assignees, of the medicines and discoveries specified in the patent.

By the constitution of the United States, art. 1, sec. 8, "The Congress shall have power to promote the progress of science and useful arts, by securing, for limited times, to authors and inventors, the exclusive right to their respective writings and discoveries."

By virtue of this section, Congress have vested in inventors, and their assignees, on the emanation of a patent, the exclusive use for fourteen years, from the date of the patent of their inventions. This delegation of power, from its nature, as well as from the expressions, "exclusive right," divested the state legislatures of all power of enacting laws concerning this grant. No act of the state government can restrict or control the beneficial or lucrative use of the patented invention, either by limiting the improvements which may be introduced into the state, or by limiting the *number, or by prohibiting all persons, except a priv- [298 ileged class, from becoming purchasers or assignees of the invention.

It is contended, by counsel for defendant, that the patent is void.

*First.* Because the discoveries were not made by the patentee.

*Second.* Because the patent of 1813, issued for the same compositions of matter, and for the same applications of them, as are contained in the patent of 1823.

The patent is *prima facie* evidence that the invention is new and useful. Fessenden's Law of Patents, 61–63, 325, 326; Lovell *v.* Lewis, 1 Mason C. C. 182. The facts stated, in the agreed case, are an admission of every legal presumption arising from an inspection of the patent, and preclude every inference to the con-

trary. How, then, can the defendant contend that, from the history of the science of medicine, with which we are not acquainted, it appears that those medical compositions, and their specific applications to diseases, are ancient inventions. He has not referred us to one citation of a scientific or medical author to support his allegation.

The patent of 1813 is not for the same discoveries as contained in the patent of 1823. From an inspection of the patents, it is apparent that there is a difference in the materials, and in the compositions of the medicines, as well as in the diseases to which each is specifically applied.

By the act of Congress, referred to in defendants' argument, a patent shall be granted for an improvement on a machine, for a new combination of matter, beneficially applied, or for a new and specific use of a machine or combination of matter already invented. If the patent of 1823 be a newly discovered combination of matter, differing in its proportions from that of either of those of 1813, or in its application to a disease, to which it was not applied, by the latter, the plaintiff can not be pronounced guilty.

In the agreed case, it is only admitted that the plaintiff, in two cases, received fees and rewards for administering to the sick some of those medicines contained in the patent of 1823, in some of those specified diseases.

299] *If the patent of 1823 should be void in part, where it pursues strictly the patent of 1813, it does not follow that it is not valid, for the residue. The compositions of matter, and the mode of application to the case of particular diseases, are distinctly stated, and can be separated. It would not be a parallel case with that in which the patent issues for the right of a machine, previously discovered and in use, setting forth an improvement, without distinguishing the original machine from the same as improved. In Thompson's patents, each medicine and its specific application are distinctly stated. On the presumption in favor of innocence, the court would infer that the acts mentioned in the agreed case were pursuant to the valid part of the patent rather than to the void. Sentence of condemnation will not pass, on a defendant, where the case submitted to the court may be true, and the defendant innocent.

That the act of Congress does admit patents to issue to the

Jordan v. Overseers of Dayton.

extent abo ve stated, is apparent from its language and expressions.

The right of the state to tax the property thus patented, or to levy a tax on the income of the patentee and his assigns, produced by prescribing and vending those medicines, need not be disputed in the investigation of this case.

The power is not denied the state legislature to levy a revenue from patented machinery or its products. We do not contend that flour manufactured in the mills where Evans' elevator is used, or the whisky manufactured in patent steam distilleries, are exempt from state taxation. We only contend that it is not in the power of the state government either to prohibit the use of those inventions, or to impair the value of them, by limiting their sale, by the grant of the monopoly of purchase, and lucrative use of a few individuals.

The counsel for the defendants in error did not recollect, while inveighing against monopolies, that he was contending for the exclusive and profitable practice of the healing art of a privileged few; that to the certain and definite grant of vesting monopolies delegated to Congress, he was adding another monopoly, to be granted by the State of Ohio, concerning the same subject matter— the state legislature granting a monopoly of a monopoly.

*It does not appear that the plaintiff in error received   [300 compensation for other acts than those authorized by the patent of selling to individuals, sick or in health, the medicines therein prescribed, and informing them of the expected effects to be produced by those medicines. This is a duty constantly performed, by unlicensed merchants and apothecaries, in the sale of patent pills and drops, either orally, or frequently by delivering to the invalid purchaser a printed paper or pamphlet, containing the prescription and certificates, exemplifying the wonderful cures to be effected by their nostrums. This was never considered as a violation of the penal law of Ohio. Should the agreed case be considered as an admission of the reception of a compensation for words and deeds, in attending the sick, other than selling to them the medicines and informing them of the cure to be effected, as stated in the patent, and this business should be considered worthy of reward (and the contrary can not surely be presumed), this gain annexed to it, having its existence exclusively as an incident of the patent, of right must belong to the patentee and

Jordan v. Overseers of Dayton.

his assigns, and can not be subject to the control of state leg-
islation.

That the state legislature is vested with the power of prohibit-
ing and punishing those who introduce poisons as medicines, or
introduce, within their jurisdiction, immoral prints or books,
whether patented or unpatented, can not be denied.

Whether the use of those specified patent medicines, by Thomp-
son and his assigns, be promotive of or deleterious to the health of
our citizens, we are as ignorant as were our ancestors with respect
to the use of mercury as a medicine, which was introduced by a
celebrated empyric and impostor, condemned for more than one
hundred and fifty years by the licensed physicians, and brought
into general use by the persons denominated quacks by the
learned.

Lowe submitted an argument on the same side.

Wicher, for defendant in error:

The only question which seems to present itself in this case is:
301]  Has the plaintiff in error practiced physic or surgery *con-
trary to a constitutional law of the land? The second clause of
the sixth article of the constitution of the United States says that,
" This constitution and the laws of the United States, which shall
be made in pursuance thereof, etc., shall be the supreme law of
the land;" and in the schedule of powers belonging to the Con-
gress of the United States, we learn that Congress has power " to
promote the progress of science and useful arts by securing, for a
limited time, to authors and inventors, the exclusive right to their
respective writings and discoveries." Hence, the plaintiff in
error would infer that a state in the Union has no right to pass a
law regulating the practice of physic and surgery which shall
conflict with an interest which he says is secured to him by
patent, in pusuance of a law of Congress; therefore the law regu-
lating the practice of physic and surgery in Ohio, so far as re-
gards him, is unconstitutional.

To refute this reasoning it is only necessary to state that a pat-
ent to secure to an author or inventor, etc., confers on him no right
that he did not possess without a patent, except a right of mo-
nopoly. An inventor has the right to use his invention, in com-
mon with every other citizen, as well before as after the date of

his patent.   A patent is an abridgment of the rights of the citizen, and secures to the patentee a monopoly of all the benefits arising from the lawful use of his invention, against all other persons wishing to use the same commodity.   "A monopoly," says Lord Coke, "is an institution, or allowance by the king by his grant, commission, or otherwise, to any person or persons, bodies politic or corporate, of, or for the sole buying, selling, making, working, or using of anything whereby any person or persons, bodies politic or corporate, are sought to be restrained of any freedom or liberty that they had before, or hindered in their lawful trade."

After the statute of James was passed Hawkins defined a monopoly thus: "A monopoly is an allowance by the king, to any person, for the sole making, selling, etc., anything, so that no person be restrained in what he had before, or in using his lawful trade."

But in order to examine the whole ground which the case may, by possibility, occupy, we will examine the patent, and *the   [302 laws under which he seeks to support it, in all their bearings.   In the year 1813, the patentee, under whom the plaintiff in error claims exemption from the laws of Ohio, obtained a patent for a pretended new discovery in the principles and practice of physic In consequence of a decision, by some court of justice in Massachusetts, against the validity of his patent, he, in 1823, took out a new one for some pretended new discovery.   An inspection of the specifications attached to each patent will show the identity of the discovery.   The following are the patents of 1813 and 1823:

### SPECIFICATIONS OF 1813.

No. 1.   Lobelia for emetic.

No. 2. · Cayenne.

No. 3.   Marsh rosemary, two parts; the bark of the roots of barberry, one part; or sumach bark, leaves, or berries, or raspberry leaves, may be substituted.

No. 4.   Balmony, barberry bark, and poplar bark.

No. 5.   To strengthen the stomach and restore the digestive powers, after cases of dysentery and other weakening disorders: Make a syrup of peach kernels, or cherry stones, gum myrrh, hot water, and sugar.

No. 6.   High wines, gum myrrh, camphor, cayenne, and spirits of turpentine.

SPECIFICATIONS OF 1823.

No. 1. Lobelia inflata for emetic.

No. 2. Cayenne, capsicum.

No. 3. Barberry bark and hemlock bark, or sumach bark, leaves, or berries, or red raspberries, or witch hazel leaves, or marsh rosemary and pond lily roots, or either of them.

No. 4. Balmony, barberry bark, and poplar bark.

No. 5. To make syrup for dysentery, promote digestion, and strengthen weak patients: Take poplar bark, the bark of the barberry root, sugar, peach meats, or cherry stones and brandy.

No. 6. High wines, gum myrrh, cayenne, to be given internally; when applied externally, add spirits of turpentine.

303] *Vapor Bath.

None of which he states, in both specifications, hath been known, or used, before this application!

The court will not close their eyes against the absurdity of these declarations, made by the same person, with an interval of ten years between the times of making them; nor will they require to be informed by me, what they are already informed of from history—that both statements are utterly false; and if false, the patent is void.

The act of Congress, passed in 1793, entitled " an act to promote the progress of the useful arts," provides " that when any person, or persons, being a citizen of the United States, shall allege that he, or they, have invented a new or useful art, machine, manufacture, or composition of matter, not known or used before the application, and shall present a petition to the secretary of state, signifying a desire of obtaining an exclusive property in the same, and praying that a patent may be granted therefor, it shall, and may be lawful, for said secretary of state to cause letters patent to be made out in the name of the United States, etc., granting to such petitioner, or petitioners, his, her, or their heirs, administrators or assigns, for a term, not exceeding fourteen years, the full and exclusive right and liberty of making, constructing, using, and vending to others to be used, the said invention or discovery."

The statute of James leaves to the crown the right to grant letters patent for " the sole working or making of any manner of new manufactures to the true and first inventor." That of the United States authorizes letters patent to be issued to any person who has invented " any new or useful art, machine, manufacture, or composition of matter, not known or used before the application."

These clauses are respectively the foundation upon which the law of patents rests in the two countries; and although the phraseology differs, they are in substance the same. There is a remarkable coincidence in these fundamental provisions of the two acts " Any manner of new manufacture," is equivalent to " any new or useful art, machine, manufacture, or composition of matter." The judicial expositions, therefore, of each will be mainly applicable to the other. The clause of our statute *just recited pre- [304 sents for our consideration the term " new." The " art, machine, manufacture, or composition of matter," for which a patent is claimed, must be " new." In relation to this point, the British statute has received a construction, which seems to me, to be at variance with its whole scope and object, and can not be justified, by any rules of construction applicable to the English language. It has been decided that a manufacture, brought from abroad, if new in England, is a new manufacture, within the meaning of the statute. The words are, " the sole working, or making any man- ner of new manufacture, within the realm; " not manufactures new within the realm. The working and making must be new within the realm, and the manufacture new—new everywhere. What kind of a new manufacture is that which is known the world over, though not yet introduced into England? What sort of a new machine is it, that has been in use for centuries in a neigh- boring kingdom? And what sort of an inventor is he who makes a trip across the channel to get it? But he must be an inventor; for the statute allows patents to issue only to the " true and first inventors." A patentee, therefore, must be an inventor, and he must swear to it, too, to bring himself within the act, or the king will withhold the grant. The received opinion, then, of the stat- ute of James appears to me to involve gross absurdities, and to be a palpable perversion of the terms and plain meaning of the act. It is a departure from its spirit, and defeats its avowed ob- ject. It is everywhere said that this prerogative power was left in the crown, for the purpose of rewarding the personal merit of ingenious men—to stimulate their inventive powers. But this al- leged object of the act is at war with its practical application, and places the plagiarist and the original inventor upon the same foot- ing. This construction is given to the statute, in the case of Edge- bury v. Stevens, the first reported decision upon the statute of James, and has its origin, I have reason to believe, in the policy of the

government. Expediency, and the policy of the state, have, no doubt, contributed to uphold it. It has been uniformly adhered to, and is everywhere laid down as established law; but I have nowhere seen it supported as the true and grammatical construc-305] tion of the language of *the act. The policy may be good; but it ought to have been supported and authorized by a legislative provision; and not founded on a judicial perversion of the language of the law.

But fortunately our own statute is not liable to the ambiguity upon which I have remarked. It allows patent monopolies to those who have invented "any new and useful art, machine, manufacture, or composition of matter not known or used before the application." This clause of the act of 1793 is plain and explicit It is not obscured by an artificial arrangement of words, generating doubts to be resolved by policy or expediency. The art, etc., must be new; not new in one place and old in another, but new both at home and abroad. A patentee must be the "inventor," and the subject of the patent must be the result of his own labors and ingenuity—not for a stolen or borrowed product. If the act of 1793 left room for a doubt, which it does not, that of 1800 would remove it. That act very clearly develops the policy of the legislature. Its provisions, and the oath it prescribes, show, too obviously to admit of doubt or misconception, that it did not mean, in any case, to grant patents or monopolies for imported or borrowed novelties, but to leave their introduction to the enterprise of the public.

While, therefore, in England, it is deemed enough if the manufacture, for which the patent is claimed, be new *within the realm*, here, I hold it most clear that the art, etc., must be *absolutely new*. It must not have been "known or used before the application," and if it were, that the patent, if obtained, would be void.

I can not so much undervalue the good sense of this court as to use an argument to show that the art, etc., must be new at the time of the application; section 3 is conclusive on this subject [read section 3]. If the act does not refer to the time of the grant of the letters patent, but to the time of the invention, why are all these descriptions necessary? The date of the discovery, then, must be determined by the date of the patent; for the discovery must have been new and not used when the patent was issued. And, in the language of the statute, "every patent which shall be

obtained, etc., for any invention, etc., which it shall afterward appear, *had been known or used, *previous to such application* [306 for a patent, shall be utterly void."

If, then, the defendant shows, that the thing pretended to be secured by patent, was in use, or had been described in some public work anterior to the date of the patent, he shows that it was so anterior to the supposed discovery by the patentee; for the discovery must be coetaneous with the patent.

Another objection to the plaintiff's patent is, that he has not, in his schedule, "furnished a written description of his invention, in such full, clear, and exact terms as to distinguish the same from all other things known before, so as to enable any person skilled in the art, etc., to make, compound, and use the same." If he does not communicate it so that it can be understood, what matters it whether the concealment be the result of fraud or negligence? In either case the public receives no equivalent for the benefit conferred upon him. It must be borne in mind that the patent or monopoly is granted in consideration of the full, fair, and intelligible disclosure. What a man has invented or discovered, it is fair to presume he can describe intelligibly; and defects in the specification, in all cases, avoids the patent. How is the design to be proved? It seldom, if ever, can; and the public may, oftentimes, after much wealth has been accumulated by the individual, and the patent expired, be left as ignorant as before it was granted.

It has been shown, then, I think, satisfactorily, that the subject of a patent must be both "*new*" and "not known or used before the application." It must also be "*useful.*" This term has been defined to mean *such an invention as is not frivolous, or injurious to the well being, good policy, or sound morality* of society. Such an invention *as may be applied to some beneficial use in society, in contradistinction to an invention which is injurious to the morals, the good health, or the order of society*—not mischievous to the state.

What can be less useful than a patent that interrupts the practice of an art, etc., commonly known? What more pernicious to the state than the monopoly of a medicine or manufacture already in use?

But, says the plaintiff, inasmuch as the patent is issued it *is presumed it is conclusive evidence that the patent was [307 rightfully issued, and, consequently, that the several states of this Union must refrain from the execution of any law made for the

protection of their citizens. But it can not escape the attention of this court, that patents are issued, as a matter of course, to all who will apply for them, swear they are inventors, and pay thirty dollars. The letters patent, it is true, when prepared, are sent to the attorney-general, who, however, never inquires into the merits of the subject, but merely takes care that the instrument is in due form.

Still I can not perceive that the argument, to which the above is an answer, has anything to do with this case. We do not seek to abridge the plaintiff of any right which he can legally enjoy. We do not wish to use his patent. The plaintiff has no more right to complain of our statutory regulation of the practice of physic, nor claim exemption from its penalties, than the patent whisky makers have from those laws which impose regulations for the sale of that article, or commodity, or composition of matter. Yet, I believe, this is the first time that any person, because he was a patantee, claimed to be above the cognizance and jurisdiction of state authorities, notwithstanding there are patents for everything we suffer to enjoy, for everything that comes within the scope of legislation.

Opinion of the court, by Judge LANE:

The case presents two questions: 1. Whether the evidence sufficiently shows that the defendant practiced medicine; and 2. Whether section 11 of the statute, imposing a penalty for practicing medicine by persons not members of any medical society, is inoperative on him, by reason of Thompson's patent.

On the first point, the case shows that Jordon *prescribed and administered* medicines to two sick persons for fees. The stipendiary character of the service forbids the belief that it was an act of neighborly kindness, or the execution of a moral duty. Administering medicine may be the office of a nurse; but prescribing medicine to the sick, implies the exercise of skill in the discrimi-308] nation of diseases, and the *selection of fit remedies; to acquire which skill is the object of medical education, and to exercise which, for fees, is but another name for the practice of medicine. In the absence of explanation, we believe the statement sufficiently shows that Jordan, in these cases, acted in the character of a physician.

In discussing the second question, I choose to divest the case of

all matters, except those arising from its simplest merits. For present purposes, therefore, I assume that the right of prescribing and administering medicines, is a proper subject for a patent, and that the patent of 1823 is to all purposes regular and effective. I proceed to consider, whether the patent conveys such a right that the authority of the state may not control its exercise.

A large portion of the duty of the lawgiver, in every civilized community, consists in regulating the conduct of individuals, in different matters, for purposes of general welfare. Some acts of this nature are the objects of penal legislation. There is no moral turpitude in vending tickets of lotteries from other states, or in selling spirituous liquors to Indians; yet the good of society demands their prohibition. Other and the larger class are, in various forms, regulated by law. Thus, the act of keeping tavern is a lawful trade; yet, because it is of public concern that the convenience of travelers be secured, and because it is conducive to public morals that intemperance be suppressed, the legislature have forbidden its indiscriminate practice, and have placed those engaging in it under the watch of the court. And for reasons in some respect similar, peddlers and ferrymen are placed under the same supervision. The exercise of police powers by municipal corporations, the laws concerning the inspection of provisions, and the fixing of rates of toll for turnpikes and bridges, are examples of similar powers. So the business of grinding grain, a work strictly private, interests so many persons, that the legislature have deemed it proper to fix a price for labor. So the profession of law is of so public a nature, that its practice is wholly forbidden until after a reasonable demonstration of ability, and until after an opportunity has been offered to learn the morals of the practitioner. And the profession of medicine is regarded, by the legislature, as of a similar character, so that policy requires an examination *should be instituted into the professional capacity [**309** of the practitioner before he shall be permitted to operate upon the health of citizens. In all these cases the interpretation of the law given, is justified by the obvious principle, that although a man's rights to his own are absolute and indefeasible, yet these rights must be so used as not to infringe the rights of others, and may be so regulated as to promote the general good.

But the plaintiff in error, without denying these matters to be the suitable and ordinary subjects of legislation, insists the power

of the legislature is limited in this case, because the patent, securing to Thompson the exclusive right of preparing and mixing medicines, emanated from the general government, under the authority of the constitution, and that its full effect can not be had unless it be holden altogether exempt from state control. This leads us to consider the nature and extent of such rights as accrue from letters patent for useful discoveries. Although the inventor had, at all times, the right to enjoy the fruits of his own ingenuity in every lawful form of which its use was susceptible, yet before the enactment of the statute he had not the power of preventing others from participating in that enjoyment to the same extent with himself; so that, however the world might derive benefit from his labors, no profits ensued to himself. The ingenious man was therefore led either to abandon pursuits of this nature, or to conceal his results from the world. The end of the statute was to encourage useful inventions, and to hold forth as inducements to the inventor the exclusive use of his inventions for a limited period. The sole operation of the statute is to enable him to prevent others from using the products of his labors except with his consent. But his own right of using is not enlarged or affected. There remains in him, as in every other citizen, the power to manage his property, or give directions to his labors at his pleasure, subject only to the paramount claims of society, which requires that his enjoyment may be modified by the exigencies of the community to which he belongs and regulated by laws which render it subservient to the general welfare, if held subject to state control. If the state should pass a law for 310] the purpose of *destroying a right created by the constitution, this court will do its duty; but an attempt by the legislature, in good faith, to regulate the conduct of a portion of its citizens, in a matter strictly pertaining to its internal economy, we can not but regard as a legitimate exercise of power, although such law may sometimes indirectly affect the enjoyment of rights flowing from the federal government.

Judgment affirmed.